IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Fredric Goldfein, derivatively on behalf of Nominal Defendant Motorola, Inc.<br><br>Plaintiff,<br><br>v.<br><br>GREGORY Q. BROWN, DAVID W. DORMAN, H. LAURANCE FULLER, JUDY C. LEWENT, THOMAS J. MEREDITH, NICHOLAS NEGROPONTE, INDRA K. NOOYI, SAMUEL C. SCOTT III, RON SOMMER, ANTHONY J. VINCIQUERRA, DOUGLAS A. WARNER III, JOHN A. WHITE, MILES D. WHITE, JAMES R. STENGEL, EDWARD J. ZANDER<br><br>Defendants,<br><br>and<br><br>MOTOROLA, INC.<br><br>Nominal Defendant | Case No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought by Plaintiff for the benefit of Nominal Defendant Motorola, Inc. ("Motorola" or the "Company") against Defendants Gregory Q. Brown ("Brown"), David W. Dorman ("Dorman"), H. Laurance Fuller ("Fuller"), Judy C. Lewent ("Lewent"), Thomas J. Meredith ("Meredith"), Nicholas

Negroponte ("Negroponte"), Indra K. Nooyi ("Nooyi"), Samuel C. Scott III ("Scott"), Ron Sommer ("Sommer"), Anthony J. Vinciquerra ("Vinciquerra"), Douglas A. Warner III ("Warner"), John A. White ("J. White"), Miles D. White ("M. White"), James R. Stengel ("Stengel"), and Edward J. Zander ("Zander") for breaches of their fiduciary duties owed to Motorola, Inc. ("Motorola") during the period from July 1, 2006 through the present (the "Relevant Period").[1]

2. During the summer of 2006, Motorola suffered poor financial performance despite public statements that portrayed financial success in the way of strong sales growth and revenues. By October 13, 2006, these statement artificially inflated Motorola's share price to over $26 per share.

3. On October 17, 2006, Defendants announced that the Company's third fiscal quarter 2006 results had failed to meet their revenue and sales projections as expected as a result of i) Motorola was unable to supply 3G phones to European customers – Europe adopted the 3G standard earlier than the United States; and ii) there was a shortfall in orders from Sprint Nextel because Motorola failed to timely develop a phone that would work on both Sprint's and Nextel's networks. During this time, the Company's shares remained partially artificially inflated, however, because Defendants directed Motorola to forecast favorable, but unrealistic earnings for the following quarter.

4. Again on January 4, 2007 Motorola's shareholders were again caught by surprise when the Company was forced to admit that its fourth fiscal quarter 2006 results would also fail to meet projections. Defendants again cited the reason for the

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between July 1, 2006 and May 14, 2008, the Relevant Period continues through this day.

missed earnings on the Company's failure to supply 3G phones to European customers.

**VENUE**

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between Plaintiff and each Defendant and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Nominal Defendant maintains its headquarters and its principal place of business is located within this District. Further, one or more Defendant has received substantial compensation in this District by engaging in numerous activities and conducting business in this district.

**PARTIES**

7. Plaintiff, Fredric Goldfein, as set forth in the Verification, is and was at relevant times hereto, a shareholder of Motorola. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation. Plaintiff is a citizen of the State of Pennsylvania.

8. Nominal Defendant Motorola is a corporation organized under the laws of the State of Delaware and maintains its principal place of business and is headquartered in Schaumburg, Illinois. The address of its Principal Executive Office is 1303 East Algonquin Road, Schaumburg, Illinois, 60196. Motorola provides technologies, products and services that make a broad range of mobile experiences. Its portfolio includes wireless handsets, wireless accessories, digital

entertainment devices, wireless access systems, voice and data communications systems and enterprise mobility products. Motorola operates in the following businesses: i) Mobile Devices; ii) Home and Networks Mobility; and iii) Enterprise Mobility Solutions.

9. Defendant Gregory Q. Brown ("Brown") is Motorola's President and Co-Chief Executive Officer ("Co-CEO") and has been, since January 2008. Brown is also a Motorola director and has been since July 2007. Brown was Motorola's Chief Operating Officer from March 2007 to December 2007; Executive Vice President from January 2003 to March 2007; President, Networks and Enterprises from January 2005 to March 2007; and President, Commercial, Government and Industrial Solutions Sector from January 2003 to January 2005. During the Relevant Period, Brown sold 244,695 shares of Motorola stock for proceeds of $5,395,210.49 while in possession of material, non-public information. Brown is a citizen of the State of Illinois.

10. Defendant David W. Dorman ("Dorman") is a Motorola director and has been since July 2006. Dorman assumed the position of Chairman of the Board in May 2008. Dorman is a member of Motorola's Governance and Nominating Committee and Finance Committee and has been since 2008. Dorman was a member of Motorola's Audit and Legal Committee from 2006-2008. Dorman is a citizen of the State of Illinois.

11. Defendant H. Laurance Fuller ("Fuller") was a Motorola director from November 1994 to May 2007. Fuller was also Chairman of Motorola's Audit and Legal Committee from 2003 to May 2007; a member of the Audit and Legal Committee from 1996 to May 2007; and a member of the Compensation and Leadership Committee from 2000 to 2002. During the Relevant Period, Fuller participated in the improper conduct

alleged herein, including, the issuance of improper statements, and the preparation of the improper press releases and SEC filings. Fuller is a citizen of the State of Illinois.

12. Defendant Judy C. Lewent ("Lewent") is a Motorola director and has been since May 1995. Lewent is Chairwoman of Motorola's Finance Committee and has been since 2008. She has been a member of the Finance Committee since 1996 and was previously Chairwoman from 2003 to 2006. Lewent is also a member of the Compensation and Leadership Committee and the Executive Committee and has been since 2008. Lewent was a member of the Audit and Legal Committee in 2005; a member of the Audit and Legal Committee from 2001 to 2002; and a member of the Audit and Legal Committee from 1996 to 1998. Defendant Lewent is a citizen of the State of Texas.

13. Defendant Thomas J. Meredith ("Meredith") is a Motorola director and has been since January 2005. Meredith was also Motorola's Acting Chief Financial Officer ("CFO") and Executive Vice President from April 2007 to March 2008. Meredith is a member of Motorola's Finance Committee and has been since 2005. Meredith was a member of Motorola's Audit Committee from 2005 to April 2007. Meredith is a citizen of the State of Texas.

14. Defendant Nicholas Negroponte ("Negroponte") was a Motorola director from May 1996 to May 2009. He was a member of Motorola's Governance and Nominating Committee. Negroponte is a citizen of the State of Massachusetts.

15. Defendant Indra K. Nooyi ("Nooyi") was a Motorola director from November 2002 to May 2007. Nooyi was also a member of Motorola's Compensation and Leadership Committee from 2003 to May 2007. Nooyi is a citizen of the State of New York.

16. Defendant Samuel C. Scott, III ("Scott") is a Motorola director and has been since May 1993. Scott is also Chairman of Motorola's Compensation and Leadership Committee since 1997, a member of the Compensation and Leadership Committee since 1993, and a member of the Executive Committee since 2008. Scott was a member of Motorola's Finance Committee from 1993 to 1996. Defendant Scott is a citizen of the State of Illinois.

17. Defendant Ron Sommer ("Sommer") was a Motorola director from July 2004 to May 2009. Sommer was a member of Motorola's Audit and Legal Committee and has been since 2008. Sommer was also a member of Motorola's Compensation and Leadership Committee from 2004 to 2008. Defendant Sommer is a citizen of the State of Illinois.

18. Defendant Anthony J. Vinciquerra ("Vinciquerra") is a Motorola director and has been since 2007. Vinciquerra is also a member of the Audit and Legal Committee and has been since 2007. Vinciquerra is a citizen of the State of California.

19. Defendant Douglas A. Warner, III ("Warner") is a Motorola director and has been since May 2002. Warner is the chairman of the Governance and Nominating Committee. Warner is also a member of Motorola's Finance Committee and has been since 2002, and a member of the Executive Committee since 2008. Warner was a member of Motorola's Compensation and Leadership Committee from 2003 to 2005. Defendant Warner is a citizen of the State of New York.

20. Defendant John A. White ("J. White") is a Motorola director and has been since May 1995. J. White is the Chairman of Motorola's Audit and Legal Committee since 2008 and has been a member since 1996. Defendant J. White is a citizen of the State of Arkansas.

21. Defendant Miles D. White ("M. White") was a Motorola director from October 2005 to May 2009. M. White was also a member of Motorola's Audit and Legal Committee in 2006. Defendant M. White is a citizen of the State of Illinois.

22. Defendant James R. Stengel ("Stengel") is a Motorola director and has been since February 2005, during which time he has served as a member of the Company's Compensation and Leadership Committee. Defendant Stengel is a citizen of the State of Ohio.

23. Defendant Edward J. Zander ("Zander") was Motorola's Chairman of the Board from January 2004 to May 2008. Zander is also Motorola's Strategic Advisor to the CEO and has been since January 2008. Zander was Motorola's CEO from January 2004 to December 2007. During the Relevant Period, Zander sold 2239,399 shares of Motorola stock for proceeds of $3,548,156.03 while in possession of material, non-public information. Defendant Zander is a citizen of the State of Illinois.

24. Defendants Brown, Dorman, Fuller, Lewent, Meredith, Negroponte, Nooyi, Scott, Sommer, Vinciquerra, Warner, J. White, M. White, Stengel and Zander are collectively referred to hereinafter as the "Individual Defendants." Defendant Brown and Defendant Zander are referred to herein as the "Insider Selling Defendants."

25. By Order dated September 23, 2008 in *Silverman v. Motorola, Inc.*, Case No. 07-CV-4507, N.D. of Ill., (the "Securities Action") the Northern District of Illinois found that plaintiffs' had successfully plead scienter against defendants Zander, Devonshire, Nottenburg and Warrior and that the individual defendants exercised control over the Company by virtue of their positions as senior executives in the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26. By reason of their positions as officers, directors and/or fiduciaries of Motorola and because of their ability to control the business and corporate affairs of Motorola, the Individual Defendants owed Motorola and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Motorola in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Motorola and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27. Each director and officer of the Company owes to Motorola and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

28. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Motorola, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Motorola, each of the Individual Defendants had access to adverse non public information about the financial condition, operations and improper representations of Motorola.

29. To discharge their duties, the officers and directors of Motorola were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Motorola were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how Motorola conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations; and

(g) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

30. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Motorola, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Motorola's Board during the Relevant Period.

31. Moreover, these actions have irreparably damaged Motorola's corporate image and goodwill. The Individual Defendants have misled the investing public, such that Motorola's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## SUBSTANTIVE ALLEGATIONS

32. By the start of the Relevant Period, Motorola was far behind its competitors in its product offerings as its product portfolio did not include the most up to date feature rich 3G cell phones that were in strong demand by consumers in the European and United States markets. Furthermore, the Company desperately needed to revamp its product line as its core product, the popular RAZR phone, was losing its cache as competitors had introduced comparable products. It was, therefore, critical to Motorola and its investors that the Company introduce a new product portfolio, including 3G capable phones, and that the products be available in sufficient quantities for the 2006 holiday selling season (the “2006 Holiday Selling season”) which occurred in

Motorola's fourth quarter of 2006.

33. Throughout the Relevant Period, Defendants issued numerous positive statements about Motorola's financial results, its launch of new 3G phones and its financial outlook. For example, Defendants represented that the Company's new 3G phones were "ready for the holiday season" and that the phones would be available in sufficient quantities for the 2006 Holiday Selling Season as the Company was not "supply constrained" in the manufacture of its new 3G phones.

34. At the start of the Relevant Period, Motorola's development and manufacture of its new 3G phones was plagued with material problems which would delay and hamper the launch of the new products such that the Company would not have sufficient inventory for the 2006 Holiday Selling Season and would report declining fourth quarter revenues and earnings as a result. By the start of the Relevant Period, Defendants knew or recklessly disregarded that Freescale Semiconductor, Inc. ("Freescale"), the manufacturer of the chipset that was to be used for Motorola's new 3G Phones, was experiencing significant design, production and quality issues which needed to be corrected before the chips would be manufactured in the quantities necessary to produce sufficient phone inventory for the 2006 Holiday Selling Season. Motorola used the Argon LV Chipset, developed with Freescale, which was spun-off from Motorola in 2004, for its new line of 3G phones. Freescale was unable to produce sufficient quantities of the Argon LV Chipset because the chipset design led to serious "mounting" problems which caused the chips to warp, thereby creating quality issues and reducing manufacturing yields. By the start of the Relevant Period, Defendants knew or recklessly disregarded that the Company was unable to procure sufficient quantities of the Argon LV Chipset for timely launch and produce sufficient inventory of

3G Phones for the 2006 Holiday Selling Season. As detailed further herein, Motorola was also plagued with problems in the development of a new software operating system for its phones which further hampered and delayed the development and manufacture of the Company's new 3G phone products.

35. The production of Motorola's 3G phones had two primary problems. Argon LV chipset production problems; and software operating system development problems. These production problems were in existence at the start of the Relevant Period and were known or recklessly disregarded by Defendants. Specifically, Defendants knew or recklessly disregarded that Motorola and Freescale were encountering major obstacles in manufacturing Argon LV chipsets that were to be used in the 3G phones Motorola intended to launch in the fourth quarter of 2006. These production patterns precluded the Company from obtaining sufficient chipsets necessary to manufacture phone inventory for the 2006 Holiday Selling Season. In spite of these problems, Defendants caused Motorola to issue public statements that promised a return to strong sales revenues and that assured shareholders of the Company's ability to produce and ship sufficient quantities of 3G phones for the 2006 Holiday Selling Season.

36. These positive statements were each materially false and misleading because they failed to disclose and misrepresented the following adverse material facts which were known by Defendants or recklessly disregarded by them:

a. that Motorola was then experiencing significant problems with the development of its new Linux software operating system which was further delaying and hampering the production of its new line of 3G phones, as detailed herein; and

b. based on the foregoing, Defendants lacked a reasonable basis for

their positive statements about Motorola, its business, prospects and new products and these statements were therefore materially false and misleading.

37. The unsubstantiated positive statements that were distributed by the Defendants during the summer of 2006 artificially inflated Motorola's share price to over $26 per share by October 13, 2006. Indeed, certain of the Defendants took advantage of this artificial inflation by selling nearly $9 million of their personally held shares.

38. On October 17, 2006, Motorola was forced to announce that its third fiscal quarter 2006 results had failed to meet Defendants' revenue and sales projections. The Company disclosed two principal reasons for the missed earnings: (i) Motorola was unable to supply 3G phones to European customers -- Europe adopted the 3G standard earlier than the U.S.; and (ii) there was a shortfall in orders from Sprint Nextel because Motorola failed to timely develop a phone that would work on both Sprint's and Nextel's networks. The Company's shares remained partially artificially inflated, however, because Defendants directed Motorola to forecast favorable, but unrealistic earnings for the following quarter.

39. Thus, on January 4, 2007, Motorola's shareholders were again caught by surprise when the Company was forced to admit that its fourth fiscal quarter 2006 results would also fail to meet projections. Defendants again laid the blame for the missed earnings on the Company's failure to supply 3G phones to European customers. Indeed, Defendants repeatedly admitted that Motorola's failure to produce sufficient quantities of 3G phones for the 2006 Holiday Selling Season was the primary factor in the Company's fourth quarter 2006 decline and that the manufacture of sufficient quantities of the Freescale chipset was the culprit.

40. In the wake of the October 17, 2006 and January 4, 2007 disclosures, Motorola's credibility has been irreparably tarnished as reflected in a $38.96 billion loss in market capitalization. Even worse, Motorola is now the subject of numerous shareholder class actions alleging securities law violations.

41. In the Spring 2007, billionaire Carl Icahn ("Icahn"), Motorola's largest individual shareholder, owning 6.3 percent of the Company, initiated a proxy battle to force the Company to increase stock buybacks and name him to the Board. Icahn felt that the Board was largely to blame for the Company's problems. Not surprisingly, the Board expended great effort opposing Icahn's proxy and, in the end, Icahn lost the battle after Zander promised investors that the Company would be profitable for the rest of the year.

42. Although the Company's Mobile Devices business segment was largely responsible for the Company's weak 2006 earnings, the Defendants failed to cause the Company to correct the segments fledgling business model. By the end of 2007, Motorola had fallen to third place in market share behind Samsung Electronics Co. and Nokia Corp., with a 14% market share, compared with over 20% a year ago, when it was number two in market share. Rather than mend the Company's fledgling Mobile Devices segment, Motorola, under Defendants' direction, issued a vague statement in January 31, 2008, claiming that the Company would explore "the structural and strategic realignment of its businesses." As late as March 2008, Brown promised the Mobile Devices business segment would make a turnaround. Unfortunately, these promises have not been fulfilled.

43. Indeed, dragged down by the Company's Mobile Devices business segment, Motorola's 2007 net sales were down 15% compared to the year earlier. Even more troubling, the Company incurred an operating loss of $553 million in 2007.

44. In addition, the Company has been forced to cut over 3,000 jobs and has watched its most talented executives and engineers leave the Company for greener pastures. Not surprisingly, in the current dire situation, the Company is having great difficulty recruiting capable individuals to fill these vital positions.

45. In early 2008, Icahn began to put pressure on Motorola to spin-off its Mobile Devices business segment. Icahn believed that only after spinning-off the Mobile Devices business segment would the Company be able to make a profit.

46. Then, in March 2008, Icahn instituted another proxy battle, this time seeking to appoint four of his allies to the Board and to have the shareholders approve a set of comprehensive corporate governance proposals that sought to: (i) give shareholders a voice with regards to executive compensation; and (ii) allow the Company to recoup all unearned incentive bonuses or other incentive payments made to all senior executives to the extent that their performance targets were later found not to be achieved or resulted from errors.

47. On March 26, 2008, Defendants announced that the Board had approved a plan to break the Company into two independent, publicly traded entities. The timing of this announcement, only days after Icahn started his proxy battle, raises serious concerns about whether this was a valid business decision or whether the decision was made to appease a renegade investor, help end the proxy battle and allow Board to entrench themselves in their positions. As discussed herein, the market has not

reacted positively to the Defendants' decision to spin-off its Mobile Devices business segment.

48. Then, only two weeks later, the Company announced that the Board had reached an agreement with Icahn effectively ending the proxy battle. According to the agreement, in exchange for Icahn ceasing his own proxy solicitation the Company would immediately appoint 34-year-old Keith Meister, the director of Icahn's investment funds to the Board and, additionally, would nominate Mr. Meister along with another of Icahn's allies, William Hambrecht, to the Board at Motorola's annual meeting to be held in early May 2008. The Company's agreement with Icahn again gives rise to serious concerns about the extent to which the agreement is the product of the Board's valid business decision and the extent to which Defendants, especially the Board, abdicated their duties and capitulated to Icahn's wishes in order to protect their positions with the Company. Specifically, notably absent from the agreement are the comprehensive corporate governance proposals that were a centerpiece of Icahn's proxy. Further, the Board had previously publicly questioned the qualifications of Mr. Icahn's nominees to join Motorola's Board.

49. On April 24, 2008, the Company announced yet another round of disappointing earnings. An operating loss of $418 million in its Mobile Devices business segment dragged down the entire Company, which posted a loss of $194 million, or 9 cents per share, for the quarter ending March 31, 2008, worse than the Company's loss a year ago of $181 million, or 8 cents per share. Further, Motorola estimated it would lose 2 cents to 4 cents a share from operations, compared with Wall Street's consensus prediction that the Company would break even.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Motorola and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Motorola, regarding the Individual Defendants' management of Motorola's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by Defendants throughout the Relevant Period; and (iv) sell nearly $9 million worth of personally held Motorola shares while in possession of material, non-public information. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

52. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least July 2006 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that Motorola was misrepresenting its business prospects and that

the Defendants had breached their fiduciary duties in managing the affairs of the Company. The Defendants also made other specific, improper statements about Motorola's financial performance and future business prospects, as alleged herein. Further, the Defendants took actions that were not the product of valid business judgment, but rather the result of an entrenchment motive.

53. The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, gross mismanagement and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Motorola common stock so they could: (i) dispose of nearly $9 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**MISLEADING STATEMENTS**

55. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Motorola a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the

Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

56. This material, non-public information principally included the fact that Motorola would not meet is earnings forecasts. Furthermore, Defendants Lawant, Dorman, Fuller, Meredith, J. White and M. White, as members of the Audit and Legal Committee, had a special duty to know and understand this material information as set out in the Audit and Legal Committee's charter which provides that the Audit and Legal Committee is responsible for reviewing the Company's quarterly earnings releases and financial information and earnings guidance provided to analysts and rating agencies.

57. Defendants Brown, Zander and Meredith as officers of Motorola, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, Defendants Brown, Zander, Meredith, Scott, Lawant, J. White, Negroponte, Warner, Sommer, M. White, Dorman, Fuller, Stengel and Nooyi as directors of Motorola had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Motorola to the investing public and the Company's shareholders during the Relevant Period.

58. On July 19, 2006, the Individual Defendants caused or allowed Motorola to issue its earnings press release for the Company's second fiscal quarter 2006. The release touted momentum in Motorola's mobile devices business that would drive

substantial sales in the upcoming third quarter. Specifically, the press release stated in relevant part:

> The company's outlook for the third quarter of 2006 is for sales of between $10.9 billion and $11.1 billion, an increase of 20 to 23 percent versus the prior-year quarter, driven primarily by continuing momentum in the Mobile Devices business.

59. Also, on July 19, 2006, Motorola held a conference call to discuss the Company's quarterly outlook for the third fiscal quarter 2006. In particular, during the call David Devonshire (Motorola's Chief Financial Officer at the time) reiterated the claim that sales would fall in the range of $10.9 billion. Defendant Zander also touted strong sales growth. Specifically, Devonshire and Defendant Zander made the following statements during the call:

> [Devonshire:] In terms of our third-quarter outlook for 2006, we are looking for sales in the range of 10.9 billion to 11.1 billion, which is up 20 to 23% versus the third quarter of 2005, reflecting the continuum up momentum in our largest business, Mobile Devices.
>
> * * *
>
> [Zander:] In 3G, we continue to grow with units up 55% quarter over quarter. And our iDEN business is as solid as ever. We had record for the second quarter and grew the business sequentially. And we continue to innovate across technologies and price tiers, 11 new handsets, and you can see many up here in terms of GSM, CDMA and iDEN.
>
> * * *
>
> Additionally, we're seeing no let-up in iDEN and are rolling out new and innovative products, including our super-rugged i580. Demand for iDEN continues to expand worldwide. In fact, this was a record second quarter for iDEN shipments.
>
> * * *
>
> As far as our outlook goes, the second half of 2006 have [sic] traditional seasonality when compared to the first half of 2006 for the industry; Mobile Devices to continue to keep delivering market share growth on a quarter-to-quarter basis and expanding operating earnings percent on a year-to-year basis. We see good things ahead for the wireless segment.

We expect the mobile device market to grow by more than 15% for the full year 2006.

* * *

Mike Walkley — *Piper Jaffray — Analyst*

Just wonder if I can dig a little bit more into your 3G outlook. Could you give us any color on maybe just WCDMA-only units and outlook for that technology in the back of the year for Motorola?

[Garriques:] From an industry perspective, I think that I have been pretty consistent on this. I am more bearish than others about the growth of wideband CDMA in the second half of this year. I still think as an industry, we are really at the beginning stages of getting the real consumer-end benefit to get people really, really excited about devices. And I think in the second half of this year, especially in the European market, it will be and wideband CDMA and HSDPA units.

I will take you through Motorola's UMTS and HSDPA roadmap for the second half of this year. It is quite on track. It is quite compelling. And I think that we will fare quite well on both UMTS and HSDPA devices in the second half of this year.

60. On September 6, 2006, Defendant Zander touted Motorola's supposedly strong business prospects at the Citigroup 13th Annual Global Technology Conference. In particular, Zander stressed that Motorola would move "aggressively" on its 3G contracts. Zander stated the following:

[Zander:] And we've been making some announcements. These happened at or before the analyst meeting, acquired a great small company in Broadbus, it gives us switched digital video for the Wireline market. Our relationship with Huawei around 3G -- I think is going to give us, not only a cost advantage but great technology, and we're teaming with them for a worldwide sales and marketing and services play for UMKS and Atris DPA technologies.

* * *

Moderator

I'll start it off. Clearly, last quarter there was a lot of concern about the momentum in the handset industry, industry-wide. And as you look into the second half, particular[ly] given the fact that you've had an opportunity to talk to your customers, the service providers, what are

you expecting in terms of the overall industry momentum in the second half? Do you think it'll be business as usual? Normal seasonality for the industry, not necessarily just for Motorola but for the industry? Or do you see anything that potentially could keep you up at night?

[Zander:] Well, it won't keep me up at night....

* * *

Moderator

And then one more question before I open it up. Clearly you have a pretty extensive portfolio of new products for the second half, particularly for the fourth quarter. Are you pretty confident in terms of your supply chain now that you won't have connector —?

[Zander:] I don't know. You talk to them, I don't.

Moderator

I was just there in August, but —
[Zander:] What did you find out?

Moderator

Well, they seem to be ready for you guys. But, I want to hear it from your perspective. Are you getting the same thing?

[Zander:] This guy is shipping this month actually. Not here in the U.S., but it's shipping, this is KRZR, I was told I could tell you that. It's shipping in parts of the world as we speak, so, this month and it will be available in the U.S., I think both in CDMA and GSM. Riser's on schedule; the MOTOFONE will ship in Q4; the MAX and the XX will ship in Q4. So, I was told that all our products are going to ship.

Now, be very careful. There's such demand for products like this that we're going to have to allocate to certain geographies and certain places. In Latin America, for example, the rocker music area is selling like hotcakes, but we don't even offer it in the United States. So you've always got to look around to see some of the products and where they're selling. So, we won't necessarily be in every geography with every product, but we will ship right now all of our products.

And the other thing I caution, I always do, is the suppliers. We move suppliers around; based on quality, based on strategic fit, based on new designs, and we're shrinking the number of suppliers and sometimes — it happened again this quarter — there was a leak out on some supplier and they were wrong. They admitted they were wrong, but it causes

> everybody to just call us and we'll tell you what's going on. I think we will.
>
> * * *
>
> Now, we have a 3G portfolio. We've got some great products coming out the end of this year — the MAX and the XX 3G Razors, and with the Huawei relationship, we're going to compete very aggressively on some of the 3G contracts going on there.

61. The above statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known:

(a) Sprint Nextel planned to defer significant orders;

(b) Motorola would not meet its sales targets in several regions, including Europe because of its own failure to timely supply the G3 phones; and

(c) As a result of the foregoing, Motorola's sales and earnings forecasts were grossly inaccurate.

## MOTOROLA'S DISAPPOINTING THIRD QUARTER 2006 SALES

62. On October 17, 2006, the Individual Defendants caused or allowed Motorola to issue an earnings press release announcing its fiscal third quarter 2006 earnings. Importantly, the earnings press release reported sales of only $10.6 billion, which missed Motorola's earlier sales range estimate of $10.9 to $11.1 billion. Nevertheless, the release went on to inaccurately forecast sales for the fourth quarter in the range of $11.8 to $12.1 billion. The earnings press release stated in relevant part:

> "While our third-quarter sales were slightly below our guidance, we are pleased with our earnings. Each of our business segments and total Motorola improved operating margin versus the second quarter of 2006, excluding highlighted items. Mobile Devices again achieved record unit shipments and sequentially improved its market share versus the second quarter," said Ed Zander, chairman and CEO. "During the quarter, GSM infrastructure sales in the Europe, Middle East and Africa region were weaker than anticipated due to customer delays in

capital spending. Additionally, sales of iDEN mobile devices were lower, caused by customer inventory reductions in anticipation of new dual-mode device shipments in the fourth quarter. With our strong balance sheet, leadership technologies and proven record of growth, Motorola is well positioned to continue creating value for its shareholders as one of the world's leading technology companies."

* * *

The company's outlook for the fourth quarter of 2006 is for sales of between $11.8 billion and $12.1 billion, an increase of 18 to 21 percent versus the prior-year quarter.

63. Also, on October 17, 2006, Motorola held an earnings conference call, during which Defendants Zander and Brown made statements concerning their strong expectations for the upcoming fourth quarter. Specifically, Brown and Zander stated:

[Zander:] While I have many positive things to say about the quarter, I do want to take a moment and explain why our sales were below the midpoint of our guidance range by about 3.5%. About half of our shortfall is due to lower-than expected GSM infrastructure sales in our EMEA — or Europe, Middle East and Africa — region. Primarily, customers delayed capital spending, plain and simple.

The other half was due to lower sales of iDEN handsets caused by customer inventory adjustments, in anticipation of our new dual-mode phones which will ship this quarter. More about that later.

* * *

[Zander:] Europe was a little bit of a challenge in the quarter, largely due to 3G....To drive 3G momentum in Q4, we're launching, of course, our RAZRXX and RAZRMAXX, and I will talk about those in just a minute....

* * *

As we look to the fourth quarter of 2006, we expect the market to grow by greater than 15% for full year 2006....

* * *

Tal Liani — *Merrill Lynch – Analyst*

In your remarks, you said that part of the reason that you had some weakness this quarter is because Nextel is waiting for dual-mode phone or was waiting, and it's now being shipped. So the question is, when I look at your

guidance versus the consensus for next quarter, the consensus is at the high end of your guidance, which means your midpoint is below consensus. So if we are going into a seasonally strong quarter, and if it was just because of Nextel waiting to get the new phones, why don't we see stronger guidance?

[Zander:] Well, first of all, I'm not going to talk about specific customers. We talked about iDEN, and we did have — as I said, that the sales weakness was two things, and that's what they were; they were GSM in Europe and also the iDEN inventory adjustments for anticipation of dual-mode.

As far as our forecast goes, we think it's a healthy, as Dave said, 18% to 20% year-over-year forecast. It [takes into] a lot of businesses that we have here, including infrastructure and other things. But in Ron's business, I think, with our new products we did say we would grow earnings year over year and we would grow market share year over year. So I just don't want to comment specifically on customers, other than to say we do think this quarter is going to be, with all our new products shipping, a good one for Mobile Devices.

* * *

Matt Hoffman — *Cowen and Company — Analyst*

The iDEN business has been very profitable for Motorola the last few years. But now that you have got a technology transition going on there, is it possible that the new dual-mode iDEN handsets will bring higher pricing, at least initially? Or are we looking more at a volume situation over the near term?

* * *

[Zander:] I just want to [more say] [sic]. The iDEN was a missed forecast, frankly, on our part and a shortfall. If we forecasted properly, we – you plan accordingly. So understand that. We think we have now forecasted for Q4 what we need to go do there, including the dual-modes, and hopefully throughout 2007.

* * *

James Faucette — *Pacific Crest — Analyst*

I just wanted to follow up on the infrastructure question, a bit of clarification. I understand that the EMEA region was a bit weaker than you had expected. But I'm wondering if you had anticipated that it would be up sequentially, as it has been the last couple of years, and this year was just down as normal seasonality would imply. Or is there something a bit broader going on there, with carriers readjusting their plans and reevaluating their priorities?

> [Brown:] No, I think you hit it right on. I think that we expected it to perform along more historical trends, either flat or slightly sequentially up in EMEA, and it just didn't materialize. So obviously, we had to readjust accordingly. But that's really the primary driver. Again, I think that was largely driven by the push- out of customer decisions, primarily, to Q4 in 2007.
>
> [Zander:] There was consolidation going on across the world. It doesn't let us off the hook for not forecasting properly in that particular area. So we have to take that one plus the iDEN one, as in July when we gave you guidance, those two things had different forecast numbers on them. They didn't materialize — one for, we know now, with the dual-mode and the GSM, our checks in the last few weeks or months actually was mostly due to moveouts, some of which you just said about, in terms of consolidation and people reassessing their capital budgets. But nothing in terms of competition in the accounts we went after and took a look at.

**THE TRUTH IS FINALLY REVEALED**

64. On January 4, 2007, Motorola was forced to revise its fourth quarter sales estimates to a range of $11.6 to $11.8 billion, significantly lower than the Company's earlier estimate of $11.8 to $12.1 billion. Motorola blamed the guidance revision on the Company's mobile devices segment. Specifically, the press release stated in relevant part:

> Motorola, Inc. today announced preliminary estimates of fourth quarter 2006 financial results. Although the company has not finalized its financial results for the fourth quarter, sales are now estimated to be in the range of $11.6 to $11.8 billion, versus the guidance given on October 17, 2006, of $11.8 to $12.1 billion. Fourth- quarter GAAP earnings per share are now estimated to be in the range of $0.13 to $.016, which is below the company's internal forecast at the start of the fourth quarter. The estimated earnings per share range includes estimated net charges, primarily non-cash of approximately $0.10 per share relating to items that are typically highlighted in the company's earnings press releases, including investment-related losses, stock compensation expenses, business reorganization charges and unusual tax expenses. The fourth quarter will represent Motorola's 24th consecutive quarter of positive operating cash flow.
>
> The shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast. In the fourth quarter, Mobile Devices unit sales were approximately 66

million units up 23 percent from the third quarter of 2006 and up 48 percent from the fourth quarter of 2005.

The fourth-quarter results for both the Networks & Enterprise and Connected Home segments are expected to meet or exceed the internal expectations of the company at the start of the fourth quarter.

"We are very disappointed with our fourth-quarter financial performance," said Ed Zander, chairman and CEO, "but we remain committed to the strategic direction and long-term financial targets we discussed all our annual analysts meeting in July 2006. We will discuss plans to improve operating profitability on January 19 when we announce fourth-quarter earnings."

65. On January 8, 2007, *Business Week Online* reported:

Motorola shares fell sharply on Jan. 5, after the wireless phone maker warned of lower than expected profits and slowing sales. The warning prompted a number of Wall Street firms to downgrade their options on the shares.

The Schaumburg, ILL.-based company said late Jan. 4 that it will have sales in the range of $11.6-$11.8 billion during the fourth quarter, versus the guidance given on Oct. 17 of $11.8-$12.1 billion.

The wireless industry has been growing more slowly recently as it matures and fewer people need to buy new phones. Companies continue selling more in developing countries, where cell phones are less widespread but also not as easy to sell at hefty prices. Industry players have had to contend with bruising competition.

* * *

Investors pummeled Motorola on Jan. 5, with the shares falling 7.8% to finish the week at $18.94 per share on the New York Stock Exchange. During the session, the stock hit a new 52-week low of $18.

* * *

Motorola said its Mobile Devices unit sales were around 66 million units, up 23% from the third quarter of 2006 and up 48% from the fourth quarter of 2005. But it also said that its sales and earnings shortfall took place in that segment, and "is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast."

66. On January 22, 2007, *Business Week Online* reported:

Less than a year ago, Motorola Chief Executive Ed Zander could do no wrong. His company was sizzling with the success of its iconic, ultraslim RAZR phone. During the second quarter, ending in June, the world's No. 2 mobile-phone maker posted a 53% jump in handsets shipped, nearly twice the growth posted by its bigger rival Nokia. Motorola's sales and profit soared as well.

Since then, growth has cooled more than the winter air off Lake Michigan in Motorola's Chicago backyard. After an early warning of a shortfall in profitability [see BusinessWeek.com, 1/5/07, "Wall Street Hangs Up on Motorola"] Motorola on Jan. 19 reported that while fourth-quarter revenue was up to $11.8 billion, net profit tumbled 48%, to $624 million from $1.2 billion. "We did not forecast properly," Zander told analysts in a conference call. "You can get off a little bit on this thing, and it can get away from you pretty quickly."

Dropping the KRZR

A lot of things got away from Motorola. The company was blindsided by pricing pressure on low-end products in emerging markets such as Latin America and on high-end products in Europe. In addition, Motorola didn't release enough phones with rich multimedia features that take advantage of the most advanced, or third- generation, wireless networks.

Cingular Wireless, which is owned by AT&T and is being renamed after its parent, had exclusive rights to the RAZR when it debuted, but didn't offer the offshoot, the KRZR, late last year. Motorola did not make the KRZR in a 3G version for use on the Global System for Mobile communications used by Cingular and most big European carriers. That means the KRZR doesn't handle services tailored for these carriers' fastest networks.

And even though it's not a 3G device, the KRZR is priced like a high-end phone. So it competes with phones offering far more robust features, including better cameras, more storage, and richer e-mail capabilities. Making matters worse, explained Motorola's mobile-phone chief Ron Garriques, makers of 3G products ratcheted down prices, putting pressure on slightly lower-tier phones like the KRZR.

* * *

To their credit, Motorola's executives aren't dodging blame. Garriques told analysts that after his wife gave birth on Jan. 8, Zander sent him a card saying, among other things, "This is the first rich experience, next-generation device Ron delivered all year."

67. On March 22, 2007, *Business Week Online* reported:

In January, when Motorola Chief Executive Ed Zander reported figures that missed analysts' estimates, he lamented how matters "can get away from you." Less than two months later, they've slipped even further. Amid sinking performance

of his flagship mobile-phone business, Zander on Mar. 21 ratcheted down financial targets for the first quarter and the full year, and announced a dramatic reorganization of top management.

The phone unit is under so much pressure that Motorola now expects first-quarter sales to be in the range of $9.2 billion to $9.3 billion, down more than $1 billion from its January forecast of $10.4 billion to $10.6 billion. And the company anticipates a loss in the range of 7 to 9 a share, rather than the 17 profit analysts were expecting. The first quarter "will be difficult and disappointing, and I also anticipate Q2 will be difficult," Sander said in a conference call with Wall Street analysts. Investors pushed the stock down nearly 5%, to $17.85, in after-hours trading.

**MOTOROLA'S DISAPPOINTING EARNINGS AND THE DEPARTURE OF KEY EMPLOYEES**

68. Defendant Zander's promise of profit would turn out to be untrue. By the end of October 2007, the Company was forced to reveal a 94% profit decline for the third quarter, compared to the year-earlier period. Motorola also suffered a sharp decline in its global cell-phone market share from 20% down to 13% and it had slipped from the number two handset maker to the number three handset maker, behind Samsung Electronics Co. and Nokia Corp.

69. On November 30, 2007, the Company announced that Zander was going to resign as CEO, effective January 1, 2008, and that he was being replaced by Motorola's President and COO, Defendant Brown. The Company also announced that Zander would remain as Chairman of the Board but would not seek re-election at the Company's annual shareholder meeting in May 2008. Finally, the Company announced that Zander would serve as a strategic advisor to Brown until January 5, 2009. According to some compensation experts, Zander will receive salary, benefits and stock worth an estimated $10.7 million, plus $5.3 million in deferred compensation, during 2008.

70. The Company's Mobile Devices business segment was largely responsible for the Company's weak 2006 earnings. Defendants failed to cause the

Company to correct the segments fledgling business model. In particular, Motorola's Form 10-K for the year ended December 31, 2007. Management's Discussion and Analysis of Mobile Devices business segment's results of operations provided as follows:

> Net sales were $19.0 billion in 2007, a decrease of 33% compared to net sales of $28.4 billion in 2006. The business incurred an operating loss of $1.2 billion in 2007, compared to operating earnings of $2.7 billion in 2006. The business had lower net sales in all regions. The decrease in net sales was primarily driven by: (i) a 27% decrease in unit shipments, (ii) a 9% decrease in average selling price ("ASP"), and (iii) decreased revenue from intellectual property and technology licensing. The operating loss was primarily due to a decrease in gross margin, driven by: (i) a 9% decrease in ASP, (ii) decreased income from intellectual property and technology licensing, (iii) a 27% decrease in unit shipments, and (iv) a $277 million charge for a legal settlement with Freescale Semiconductor, partially offset by savings horn supply chain cost-reduction initiatives. Our global handset market share for the full year 2007 was approximately 14%, a decrease of approximately 8 percentage points versus full year 2006.
>
> * * *
>
> The Mobile Devices business faced significant challenges in 2007. While overall market demand remained strong during the year, demand for Motorola's wireless handsets slowed substantially. As a result, Mobile Devices net sales were down 33% compared to 2006 and the business incurred an operating loss of $1.2 billion.
>
> Unit shipments in 2007 were 159.1 million, a 27% decrease compared to unit shipments of 217.4 million in 2006. The decrease in unit shipments resulted primarily from gaps in the segment's product portfolio, including limited offerings of 3G products and products for the Multimedia and Mass Market product segments, as well as an aging product portfolio. As a result, Motorola believes it lost 8 percentage points of market share and estimates its global market share to be approximately 14% for the full year 2007.

71. Indeed, dragged down by the Company's Mobile Devices business segment, Motorola's 2007 net sales were down 15% compared to the year earlier. Even more troubling, the Company incurred an operating loss of $553 million in 2007. The Company's stock has lost more than half its value in the past six months.

72. Based in large-part on the Defendants' failure to provide direction with regard to the Mobile Devices business segment, Motorola began to lose many of its most talented employees. In this regard, on March 6, 2008, the *Financial Times* reported the following:

> Motorola, the US mobile phone maker, said on Thursday that Casey Keller, its chief marketing officer, had resigned less than 18 months after taking the job. Mr. Keller is the latest of a string of senior executives to leave the Schaumburg, Illinois- based group in the past year. His departure underlines the turmoil at Motorola as Greg Brown, recently appointed chief executive, battles to return the mobile unit to profit and halt the slide in market share.

73. One day later, on March 7, 2008, the Company was forced to make known that another key member of Motorola's management, Stu Reed the president of the Mobile Devices business segment, would resign and Motorola's CEO Defendant Brown would take direct control of the fledgling business segment.

74. Defendant Brown then faced the daunting task of running the day-to-day operations of the Mobile Devices business segment and also overseeing the entire Company. While nobody could challenge Defendant Brown's vigor, many questioned whether he would be able to adequately handle one, let alone both behemoth tasks. In fact, *Fortune Magazine Online* reported that Defendant Brown has spent about 80% of his time managing the Mobile Devices business segment. In fact, as discussed herein, as a result of the Defendants' mismanagement, the Company's precipitous decline continues.

75. On April 3, 2008, Motorola issued a press release announcing that the Company had cut 2,600 employees. The press release stated in relevant part:

> During the first quarter of 2008, Motorola, Inc. (the "Company") has taken specific actions relating to workforce reductions that will result in severance costs relating to approximately 2,600 employees. The result will be a net pre-tax charge in the first quarter of 2008 totaling

> approximately $104 million, comprised of $113 million in charges for severance costs, partially offset by $9 million of reversals for accruals from prior periods that are no longer needed. All of the above estimated charges are expected to result in future cash expenditures during 2008. All three of the Company's business segments, as well as various corporate functions, are impacted by these plans.

76. Then, on April 24, 2008, the Company announced yet another round of disappointing earnings. An operating loss of $418 million in its Mobile Devices business segment dragged down the entire Company, which posted a lost $194 million, or 9 cents per share, for the first quarter ending March 31, 2008, worse than the Company's year-ago loss of $181 million, or 8 cents per share. Further, Motorola estimated it would lose 2 cents to 4 cents a share from operations in the second quarter 2008, excluding any restructuring costs.

**The Spin-off of Mobile Devices**

77. On March 26, 2008, the Defendants caused the Company to shock the market by announcing that the Board had approved a plan to break the Company into two independent, publicly traded entities. According to an article published the same day entitled "Motorola Spins Off Struggling Mobile Device Business," Defendant Brown claimed the split of Mobile Devices would help "enhance the pace of recovery in Mobile Devices, to pave the way for its return as a leader in its industry, to accelerate our efforts to attract a new leader and to create shareholder value."

78. However, the timing of this announcement, only days after Icahn started his proxy battle, raises serious concerns about whether this was a valid business decision or whether the decision was made to appease a renegade investor and help end the proxy battle. For example, *Financial Times* published an article titled, "Motorola Demerger Fits Plan by Icahn," which questioned the business judgment of the split. The article stated, "Motorola... appeared to have bowed to pressure from Carl Icahn, the

activist billionaire investor, who has been hounding the company to separate its ailing handset business." On the same day, *Tech Confidential Online* struck a similar chord with an article titled, "Motorola Satisfied at Least One of Icahn's Demands, Plans to Shed Handset Unit."

79. Indeed, at the conference call discussing the decision on March 26, 2008, when asked by Lehman Brothers analyst Jeff Kvaal whether Motorola had discussed "the principle of splitting the Company" with Icahn's group and whether there would be "further developments in that discussion for board members," Defendant Brown responded, "yes" then quickly backtracked, saying that the decision was the result of the Board's review of "strategic and structural alternatives."

80. Even Icahn himself acknowledged that the Board's decision was largely based on its desire to end the proxy battle rather than a reasoned business decision. In an open letter to Motorola's Board on March 26, 2008, Icahn questioned, "[w]hy does it take the threat of a proxy fight for you to make promises we all want to hear?"

81. However, many industry analysts disagreed with the business logic behind separating Mobile Devices from the rest of the Company. Greg Gorbatenko, an analyst with Jackson Securities in Chicago did not believe a spin-off of Mobile Devices would create much value, commented, "any incremental value that they can eke out (of a top chief executive)" for Mobile Devices they will pay for in correlating salary. RBC Capital analyst Mark Sue commented, "we're not sure that being separated offers a more nimble organization that can fend off competitors and make good products." Mr. Sue further commented that, "the initial level of excitement here may settle as investors consider the level of disruption that may be caused as the businesses are split in two." Wachovia analyst David Wong wrote to investors, "we are skeptical as to whether

separating the mobile devices business will improve the pace of recovery in this division, we believe that the eventual recovery of the handset business could best be achieved by the handset division remaining associated with the other, stable and profitable, business lines."

82. Ben McCure, from McClure & Co., an independent research consultancy shared similar misgivings about splitting the Company, commenting:

> Moreover, advantages exist for keeping Motorola's mobile device business clumped together with its remaining home & network mobility business, which sells television set-top boxes, modems and network infrastructure, and its enterprise mobility unit, which sells computing and communications equipment for businesses. They share a lot of the same core patents and technology. Motorola needs innovation, not distraction. Dividing expenses like R&D and the cost of maintaining a global presence would add to the overall costs of doing business, without adding any revenue. What's more, drastic cost cuts to make a standalone handset business more attractive for spinoff investors, will only detract from the business needs most phones that get customers excited.

83. Like many analysts had warned, the market did not react positively to Motorola's announcement. On March 26, 2008, Fitch Ratings, which currently lists Motorola's credit for unsecured credit as Lower Medium Grade, placed Motorola on its Credit Watch List after the announcement.

84. Notwithstanding the market's trepidation regarding the Board's decision to spin-off the Mobile Devices business segment, one thing regarding the decision is for certain: the challenges that lay ahead for Motorola's leadership creating a stand-alone business are significant and may be more than the Company can handle in its current state of affairs.

85. On March 26, 2008, during a conference call discussing the Board's decision to split Mobile Devices, Defendant Brown commented, "it will take some time to

work through a lot of the different issues around segregation, intellectual property, brand, shared services, systems and the like."

86. According to research analyst Ben McClure, time is not on Motorola's side. McClure has even commented that "the effort needed to do the spinoff may only increase the turmoil, and by the time a deal is done the unit's market share could shrink even further."

87. With Motorola having to both focus on the migration of its Mobile Devices business segment and finding a way to revive its severely slumping stock, many analysts believed it would not take long for low-ball offers to start rolling in for the sale of the Company's Mobile Devices business segment. As predicted, on April 1, 2008, the *Financial Times* reported that Videocon, an Indian electronics group had approached the Company with an expression of interest in the Mobile Devices business unit. If the Defendants are not able to resolve the Company's woes soon, there may be no choice but to sell off the segment for whatever price it can muster.

88. On April 7, 2008, the Defendants caused the Company to announce that the Board had reached an agreement with Icahn effectively ending the proxy battle. According to the Company, the agreement would provide the following:

> [T]he Company expanded its board of directors (the "Board") to fourteen members and appointed Mr. Meister, a managing director of the Icahn investment funds and principal executive officer of Icahn Enterprises L.P., as a director effective immediately. Pursuant to the Agreement, the Board William R. Hambrecht for election as directors at the 2008 annual Meeting of Stockholders.
>
> In addition, pursuant to the Agreement,
>
> - The Icahn Group have agreed to cease efforts related to their own proxy solicitation, which was described in the preliminary proxy statement on Schedule 14A filed on March 12, 2008 by

the Icahn Group and certain other entities controlled by Mr. Icahn with the Securities and Exchange Commission.

- The Icahn Group have agreed, so long as Mr. Hambrecht and/or Mr. Meister is a member of the Board, (1) not to conduct, support, or participate (as part of a group or otherwise) in, any proxy or consent solicitations, including without limitation with respect to the removal or election of directors and (2) not to make statements or announcements that constitute an ad hominem attack on the Company, its officers or its directors.

- The Company has agreed to appoint Mr. Hambrecht and Mr. Meister to any committee of the Board designated to oversee the Company's announced plan to separate the Company's mobile devices business and the Company's broadband and mobility solutions business. The Company has also agreed (1) to seek the input of Mr. Icahn, Mr. Hambrecht and Mr. Meister regarding significant matters in connection with such plan to separate and (2) that the new company which includes the Company's mobile devices business following the separation will not have certain takeover-related protections.

89. On April 7, 2008, the *Financial Times Online* published an article titled, "Motorola Bows to Icahn Demands." The article provided in relevant part:

> Motorola has bowed to pressure from Carl Icahn, the billionaire investor, agreeing to put two of his nominees on its board and ending a bitter proxy battle ahead of next month's annual meeting. The settlement under which both sides agreed to stop all litigation, comes just 10 days after Motorola bowed to another key Icahn demand and agreed to spin off its troubled handset business.

90. Notably absent from the agreement is the implementation of the comprehensive corporate governance proposals that were a centerpiece of Icahn's proxy. This is particularly troubling considering The Corporate Library, which tracks corporate governance, gave Motorola during this time a "D" or "High" in corporate governance risk assessment.

91. Further, the Board had previously publicly questioned the qualifications of Icahn's nominees to join Motorola's Board. According to Icahn's March 26, 2008 letter to

the Board, Defendant Warner, current chair of Motorola's Nominating Committee commented that Mr. Meister did not "qualify" for the Company's Board. In fact, Institutional Shareholder Services, which also tracks corporate governance, said in a report that Mr. Meister, who is in his thirties "lacks the industry experience and objectivity to act in the best interest of all." Nonetheless, the Board approved the agreement with Icahn and gave Mr. Meister a seat.

92. Thus, the Company's agreement with Icahn again gives rise to serious concerns about the extent to which the agreement is a valid business decision and the extent to which Defendants, especially the Board, abdicated their duties as officers and directors and capitulated to Icahn's wishes. In fact, the Board's decision was not based on valid business judgment, but rather to protect their positions with the Company by ridding themselves of Icahn's lawsuit seeking information regarding the extent to which the Board failed in their duties and ensuring that Icahn's extensive corporate governance proposals and his slate of Board nominees would not be approved by the Company's shareholders.

**DAMAGES TO MOTOROLA CAUSED BY THE INDIVIDUAL DEFENDANTS**

93. As a result of the Individual Defendants' improprieties, Motorola disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated Motorola's credibility as reflected by the Company's $38.96 billion market capitalization loss. Additionally, Motorola is now the subject of several shareholder class action lawsuits alleging securities laws violations. The Company will face substantial costs in connection with these lawsuits. The Insider Defendants fared much better as evidenced from their nearly $9 million worth of illegal insider trading proceeds.

## ILLEGAL INSIDER SELLING

94. While in possession of the undisclosed material adverse information regarding the fact that: (i) Sprint Nextel planned to defer significant orders; (ii) Motorola would not meet its sales targets in several regions, including Europe because of its own failure to timely supply the G3 phones; (iii) as a result of the foregoing, Motorola's sales and earnings forecasts were grossly inaccurate, the Insider Selling Defendants sold the following shares of Motorola stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BROWN | 7/27/2006 | 8,900 | $22.08 | $196,512.00 |
| | 7/27/2006 | 7,000 | $22.09 | $154,630.00 |
| | 7/27/2006 | 44,800 | $22.10 | $990,080.00 |
| | 7/27/2006 | 37,090 | $22.12 | $820,430.80 |
| | 10/20/2006 | 900 | $23.26 | $20,934.00 |
| | 10/20/2006 | 10,000 | $23.27 | $232,700.00 |
| | 10/20/2006 | 4,000 | $23.28 | $93,120.00 |
| | 10/20/2006 | 42,000 | $23.30 | $978,600.00 |
| | 10/20/2006 | 5,000 | $23.31 | $116,550.00 |
| | 10/20/2006 | 12,000 | $23.32 | $279,840.00 |
| | 10/20/2006 | 5,000 | $23.34 | $116,700.00 |
| | 10/20/2006 | 7,700 | $23.35 | $179,795.00 |
| | 10/20/2006 | 6,040 | $23.36 | $141,094.40 |
| | 10/23/2006 | 16,500 | $23.25 | $383,625.00 |
| | 10/23/2006 | 1,437 | $23.26 | $33,424.62 |
| | 1/1/2007 | 7,957 | $20.56 | $163,595.92 |
| | 11/3/2007 | 20,181 | $17.95 | $362,248.95 |
| | 1/1/2008 | 8,163 | $16.04 | $130,934.52 |
| | 1/14/2008 | 27 | $14.64 | $395.28 |
| | | **244,695** | | **$5,395,210.49** |
| | | | | |
| ZANDER | 11/3/2007 | 30,272 | $17.95 | $543,382.40 |
| | 12/31/2007 | 98,167 | $16.04 | $1,574,598.68 |
| | 1/5/2008 | 82,251 | $15.07 | $1,239,522.57 |
| | 1/14/2008 | 651 | $14.64 | $9,530.64 |
| | 5/7/2008 | 18,058 | $10.03 | $181,121.74 |
| | | **229,399** | | **$3,548,156.03** |

## PLAINTIFF'S DEMAND ON THE BOARD WAS IGNORED

95. Plaintiff brings this action derivatively in the right and benefit of Motorola to redress injuries suffered and to be suffered by Motorola as a result of the breaches of fiduciary duty by the Individual Defendants.

96. Plaintiff will adequately and fairly represent the interests of Motorola and its shareholders in enforcing and prosecuting its rights.

97. Plaintiff is the owner of Motorola common stock and was an owner of Motorola at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

98. Plaintiff made a demand ("Demand") on Motorola's Board to investigate the allegations alleged herein on August 30, 2007.

99. In response to Plaintiff's Demand, on September 25, 2007, the Company and Board's counsel sent to Plaintiff's counsel a letter stating they would respond in "due course."

100. On December 3, 2007, Plaintiff received a letter from the Board's counsel stating that the Board considers Plaintiff's allegations in his demand letter to be "nonspecific" in an effort to stonewall Plaintiff's demand. Plaintiff sent a follow-up letter to the Board on February 15, 2008 outlining again the specifics of Plaintiff's demand.

101. Approximately two (2) years later, after not receiving any response from the Board to Plaintiff's February 15, 2008 letter, Plaintiff again sent a letter to the Board on February 3, 2010 advising them that he has not received any correspondence regarding Plaintiff's demand and that the Board is still under an obligation to immediately commence a reasonable and good faith investigation.

102. At the time of filing this action, the Board has not attempted any further contact with Plaintiff's counsel or substantively responded to Plaintiff's demand.

103. The refusal to respond to Plaintiff's Demand or seek input from Plaintiff evidences a lack of a good faith exercise of the Board's business judgment.

104. Further, as a direct and proximate result of Individual Defendants' actions, Motorola has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a. costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

b. costs incurred to carry out a proxy fight;

c. costs incurred to carry out the spin-off of the Mobile Devices business segment;

d. costs incurred from compensation and benefits paid to the Defendants who have breached their fiduciary duties to Motorola; and

e. jeopardized future business contracts because of Motorola's inability to deliver its products as promised.

105. Moreover, these actions have irreparably damaged Motorola's corporate image and goodwill. For at least the foreseeable future, Motorola will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Motorola's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty for Improper Financial Reporting

106. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107. The Individual Defendants owed and owe Motorola fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Motorola the highest obligation of good faith, fair dealing, loyalty and due care.

108. The Individual Defendants, and each of them, breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

109. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Motorola has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

111. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

## <u>SECOND CAUSE OF ACTION</u>

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

112. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113. At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Motorola common stock on the basis of such information.

114. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Motorola common stock.

115. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Motorola common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

116. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**THIRD CAUSE OF ACTION**

**Against All Defendants for Waste of Corporate Assets**

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Defendants have caused Motorola to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially hundreds of millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

119. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

120. Plaintiffs, on behalf of Motorola, have no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against All Defendants for Unjust Enrichment**

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Motorola.

123. Plaintiffs, as shareholders and representatives of Motorola, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C. Awarding to Motorola restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Date: March 29, 2010

FREDRIC GOLDFEIN

By: s/ James T. Crotty
One of the Attorneys for the Plaintiff

James T. Crotty, Esq. (0549029)
James T. Crotty & Associates
208 S. LaSalle St. – Suite 1750
Chicago, IL 60604-1170
Telephone: 312-623-1599
Facsimile: 312-553-1586
jamestcrotty@aol.com
Counsel for Plaintiff

William B. Federman, Esq.
Sara E. Collier, Esq.
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: 405-235-1560
Facsimile: 405-239-2112
wbf@federmanlaw.com
sec@federmanlaw.com
Counsel for Plaintiff

## VERIFICATION

I, Fredric Goldfein, declare under oath that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare under oath that I am a current holder, and have been a holder, of Motorola, Inc. common stock during relevant times in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: March 17, 2010

__________________________